No. 23-3969

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

Fair Housing Center of Metropolitan Detroit,

*Plaintiff-Appellant,*

v.

Singh Senior Living, LLC, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
No. 2:21-cv-12212-GCS-KGA
Hon. George Caram Steeh

_____

# APPELLANT'S OPENING BRIEF

_____

Andrew Rozynski
David John Hommel
Reyna Lubin
Eisenberg & Baum LLP
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com
dhommel@eandblaw.com
rlubin@eandblaw.com
*Attorneys for Appellant*

# CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure and Sixth Circuit Rule 26.1, counsel for Plaintiff-Appellant certify that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in the outcome. Plaintiff-Appellant is a fair housing center.

# TABLE OF CONTENTS

**Page**

**CORPORATE DISCLOSURE STATEMENT**.......................................................i

**TABLE OF CONTENTS**...................................................................... iv

**TABLE OF AUTHORITIES**.................................................................. iv

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**..................................... 1

**STATEMENT OF JURISDICTION** ........................................................... 2

**STATEMENT OF THE CASE**.................................................................. 2

    I.     The Fair Housing Center investigated whether Waltonwood would provide ASL interpreters............................................................................. 2

    II.    Waltonwood categorically refused to provide interpreters despite being told that a prospective deaf resident could only communicate in ASL..... 3

         A.    Royal Oak testing ...................................................... 4

         B.    Lakeside testing ........................................................ 5

         C.    Necessity of interpreters at Waltonwood....................... 7

    III.   The District Court granted summary judgment in Waltonwood's favor, concluding that the Fair Housing Center failed to show how ASL interpreters were "necessary" ................................................. 8

**SUMMARY OF THE ARGUMENT** ........................................................... 9

**ARGUMENT** .................................................................................. 13

    I.     Standard of review.................................................................. 13

II.     Summary judgment was improper because whether an accommodation "may be necessary" is a fact-intensive analysis, especially given Waltonwood's categorical refusal to provide ASL interpreters ............... 13

**CONCLUSION**................................................................................... 27

**CERTIFICATE OF COMPLIANCE** ................................................. 29

**CERTIFICATE OF SERVICE** ........................................................ 30

**ADDENDUM** .................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabi v. Atlanta Pub. Schs.*,
No. 1:12-cv-0191-AT, 2013 U.S. Dist. LEXIS 188129
(N.D. Ga. Sept. 26, 2011) ................................................................... 23

*Anderson v. City of Blue Ash*,
798 F.3d 338 (6th Cir. 2015) ............................................................... 15

*Bachman v. Swan Harbour Ass'n*,
252 Mich. App. 400, 653 N.W.2d 415 (2002).................................... 14

*Bax v. Drs. Med. Ctr. of Modesto, Inc.*,
52 F.4th 862 (9th Cir. 2022) ......................................................... 12, 18

*Chisolm v. McManimon*,
275 F.3d 315 (3d Cir. 2001)................................................................ 14

*Fair Hous. Justice Ctr., Inc. v. Allure Rehab. Servs. LLC*,
No. 15CV6336RJDLB, 2017 U.S. Dist. LEXIS 157882,
(E.D.N.Y. Sept. 26, 2017)................................................................... 20

*Fair Hous. Ctr. of Metro. Detroit v. Am. House Senior Living, LLC*,
No. 21-11061, 2023 U.S. Dist. LEXIS 211631
(E.D. Mich. Nov. 28, 2023) ................................................................ 16

*Gorder v. Grand Trunk W. R.R., Inc.*,
509 F.3d 265 (6th Cir. 2007) .............................................................. 13

*Groner v. Golden Gate Gardens Apartments*,
250 F.3d 1039 (6th Cir. 2001) ..................................................... 12, 14

*Heyer v. United States Bureau of Prison*,
984 F.3d 347 (4th Cir. 2021) ................................................................ 3

*Hollis v. Chestnut Bend Homeowners Ass'n,*
   760 F.3d 531 (6th Cir. 2014) .......................................................... 14, 15

*Howard v. City of Beavercreek,*
   276 F.3d 802 (6th Cir. 2002) .......................................................... 16

*Isle Royale Boaters Ass'n v. Norton,*
   330 F.3d 777 (6th Cir. 2003) .......................................................... 10

*Johnson v. City of Saline,*
   151 F.3d 564 (6th Cir. 1998) .......................................................... 23

*Jones v. City of Akron,*
   No. 19-3286, 2020 U.S. App. LEXIS 35650
   (6th Cir. Nov. 12, 2020) ................................................................ 14

*Liese v. Indian River Cty. Hosp. Dist.,*
   701 F.3d 334 (11th Cir. 2012) ........................................................ 14

*Mayberry v. Von Valtier,*
   843 F. Supp. 1160 (E.D. Mich. 1994) ............................................ 25

*McBride v. Mich. Dep't of Corr.,*
   294 F. Supp. 3d 695 (E.D. Mich. 2018) .......................................... 23

*McKay v. Federspiel,*
   823 F.3d 862 (6th Cir. 2016) .......................................................... 13

*Noll v. IBM,*
   787 F.3d 89 (2d Cir. 2015) .......................................................... 3, 25

*Phillips v. Acacia on the Green Condo. Ass'n,*
   No. 20-4182, 2022 U.S. App. LEXIS 14688 (6th Cir. May 26, 2022) ............... 15

*Pierce v. District of Columbia,*
   128 F. Supp. 3d 250 (D.D.C. 2015) ........................................ 12, 24, 25

*Rogers v. Colo. Dep't of Corr.,*
   No. 16-cv-02733-STV, 2019 U.S. Dist. LEXIS 159001
   (D. Colo. Sep. 18, 2019) ................................................................ 23

*Sacred Heart Rehab. Ctr., Inc. v. Richmond Twp.*,
  No. 08-12110, 2010 U.S. Dist. LEXIS 106739
  (E.D. Mich. Oct. 6, 2010) ...................................................................... 24

*Searls v. Johns Hopkins Hosp.*,
  158 F. Supp. 3d 427 (D. Md. 2016) ...................................................... 23

*Silva v. Baptist Health S. Fla., Inc.*,
  856 F.3d 824 (11th Cir. 2017) ....................................................... 17, 22

*Smith & Lee Assocs. v. City of Taylor*,
  102 F.3d 781 (6th Cir. 1996) .................................................................. 15

*Southwest Fair Hous. Council v. WG Campana del Rio SH LLC*,
  No. CV-19-00179-TUC-RM, 2021 U.S. Dist. LEXIS 18357
  (D. Ariz. Feb. 1, 2021), *aff'd*, No. 22-16345 (9th Cir. 2023) .............................. 26

*Southwest Fair Hous. Council v. WG Chandler Villas SH LLC*,
  No. CV-19-00178-TUC-RM, 2021 U.S. Dist. LEXIS 53677
  (D. Ariz. Mar. 22, 2021), *appeal dismissed,* No. 23-16081
  (9th Cir. Jan. 17, 2024) ........................................................... 18, 19, 20

*Southwest Fair Hous. Council v. WG Scottsdale LLC*,
  No. CV-19-00180-TUC-RM, 2021 U.S. Dist. LEXIS 43115
  (D. Ariz. Mar. 8, 2021), *aff'd*, No. 22-16345 (9th Cir. Oct. 17, 2023). ... 18, 19, 20

*Tauscher v. Phx. Bd. of Realtors, Inc.*,
  931 F.3d 959 (9th Cir. 2019) .................................................... 11, 20, 21

*United States v. California Mobile Home Park Mgmt. Co.*,
  29 F.3d 1413 (9th Cir. 1994) .................................................................. 24

*United States EEOC v. UPS Supply Chain Sols.*,
  620 F.3d 1103 (9th Cir. 2010) ................................................................. 3

*Updike v. Multnomah Cty.*,
  870 F.3d 939 (9th Cir. 2017) ......................................... 3, 16, 17, 18

**Statutes**

28 U.S.C. § 1291 ................................................................................ 2

28 U.S.C. § 1331 ................................................................................ 2

28 U.S.C. § 1343 ................................................................................ 2

42 U.S.C. § 3604(f)(3)(B) ........................................................ 2, 10, 14, 15

M.C.L. § 37.1506a(1)(b) ................................................................ 10, 14

**Regulation**

28 C.F.R. § 36.303(c) ................................................................ 11, 12, 21

**Other Authorities**

U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, ADA
Requirements, Effective Communication (Feb. 28, 2020),
https://bit.ly/2PqLHpD ................................................................ 26, 27

U.S. Dep't of Justice, Title II Technical Assistance, ADA Best Practices Tool Kit
for State and Local Governments – Ch. 3, A. Providing Equally Effective
Communication (Feb. 27, 2007),
https://archive.ada.gov/pcatoolkit/chap3toolkit.htm ................................ 22

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure and Sixth Circuit Rule 34(a), Plaintiff-Appellant hereby respectfully requests oral argument on the present appeal. This appeal raises important issues under state and federal antidiscrimination laws to ensure that all people, including deaf individuals, have equal access to nursing homes and assisted living facilities through the provision of reasonable accommodations.

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1291 because it is an appeal from a final decision of the District Court. On October 28, 2023, the District Court issued a final order granting summary judgment to the Defendants-Appellees and dismissing all claims. The next day, Plaintiff-Appellant filed a timely notice of appeal.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

At issue is whether the District Court erred in granting summary judgment to Defendants-Appellees by failing to construe all facts and inferences in favor of Plaintiff-Appellant and misinterpreting the legal standards set forth in 42 U.S.C. § 3604(f)(3)(B), which establishes a fact issue regarding whether an accommodation "may be necessary"—here, the provision of an interpreter for a deaf individual who communicates exclusively in American Sign Language.

## STATEMENT OF THE CASE

### I.     The Fair Housing Center investigated whether Waltonwood would provide ASL interpreters

Plaintiff-Appellant Fair Housing Center of Metropolitan Detroit is a nonprofit organization seeking to ensure that all people, including deaf individuals, have equal access to housing. Opinion and Order, RE 35, PageID.1212. In connection with its mission, the Fair Housing Center investigated nursing homes and assisted living

facilities, such as those with Defendants-Appellants (collectively, "Waltonwood"), to determine whether they would provide American Sign Language ("ASL") interpreters for prospective residents who are deaf. Opinion and Order, RE 35, PageID.1212-1213. Testers posed as relatives of deaf individuals to investigate if Waltonwood would be willing to provide ASL interpreter services. Testing File, RE 32-5, PageID.702 & 721.

ASL "interpreters are a common form of reasonable accommodation." *Noll v. IBM*, 787 F.3d 89, 96 (2d Cir. 2015). "To deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language." *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017). "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *United States EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1105 (9th Cir. 2010) (internal citations omitted).

## II. Waltonwood categorically refused to provide interpreters despite being told that a prospective deaf resident could only communicate in ASL

Waltonwood's facilities provide housing to seniors. Royal Oak offers assisted living, and Lakeside provides three levels of care: independent living, assisted living, and memory care. Opinion and Order, RE 35, PageID.1212-1213. Waltonwood's

facilities offer a range of services to its residents: providing meals and assistance with bathing and getting dressed, administering medication to residents, conducting safety checks for all residents, and hosting various group activities, such as lectures. Opinion and Order, RE 35, PageID.1214.

## A.     Royal Oak testing

The Fair Housing Center engaged in three tests at Waltonwood's Royal Oak facility: (1) June 2019 with a follow-up, (2) March 2020, and (3) July 2020 with a follow-up. Testing File, RE 32-5, PageID.702. In the third test, a tester asked Royal Oak "if they provided ASL services" because the tester's dad was "deaf from birth and cannot lipread, read or write English." *Id.* Ultimately, Royal Oak stated that "the facility couldn't pay for an ASL interpreter," *id.*—even though Royal Oak has offered no evidence of undue burden. Tyshka Dep., RE 32-7, PageID.790-793. Instead, Royal Oak directed the tester to two other facilities, which had "sources to find an ASL interpreter." Testing File, RE 32-5, PageID.719-720.

This final exchange is the most relevant of three tests and reveals a categorical refusal to provide interpreters. In the first test, on June 24, 2019, a tester visited Royal Oak, representing that he was visiting on behalf of his deaf sister. Testing File, RE 32-5, PageID.702. The tester informed Royal Oak's agent, Danielle Wagner, who was a marketing manager, that his sister was severely hearing impaired and asked if anyone on staff was trained in ASL. Testing File, RE 32-5, PageID.702 &

704. The agent, Ms. Wagner, said that she did not know but would ask and get back to him. Testing File, RE 32-5, PageID.702. When Ms. Wagner followed up, she informed the tester that the nursing supervisor confirmed Royal Oak did not have anyone on staff trained in ASL. *Id.* Ms. Wagner suggested that the sister could use a communication board. *Id.*[1]

On March 18, 2020, a tester contacted Royal Oak, informed the agent that his cousin was deaf, and asked if the facility had an ASL interpreter available. *Id.* In response, Royal Oak's agent stated that the facility did not have on available but would make one available when the resident moved in. *Id.* To determine whether this response was mere sales talk (or puffery), the third test took place, and Royal Oak confirmed a categorical refusal to provide interpreters.

### B.    Lakeside testing

The same result happened at Waltonwood's Lakeside facility after the Fair Housing Center engaged in three tests there: (1) May 2019, (2) twice in March 2020, and (3) July 2020 with a follow-up. Testing File, RE 32-5, PageID.721. In the third test, a tester asked Lakeside "if they (the facility) would provide an ASL interpreter" because the tester's dad was "born deaf and cannot lipread or write English." *Id.*

---

[1] During discovery, Ms. Wagner confirmed that at no point during her training was she informed that Waltonwood would be able to provide ASL interpreters at no cost to its residents. Wagner Dep., RE 32-9, PageID.895. Ms. Wagner also confirmed that "she did not know that" interpreter services could be made available as needed to prospective residents. Wagner Dep., RE 32-9, PageID.896.

Lakeside stated that "they do not provide ASL interpreters" and suggested that the tester "hire someone." *Id.* Specifically, the tester spoke with someone named Lauren Vollmer, the facility's marketing manager, Testing File, RE 32-5, PageID.732 & 735-736, who confirmed that on a decision like this, she would have consulted with her executive director, the highest-ranking employee at the facility. Vollmer Dep., RE 32-8, PageID.855-856. Ms. Vollmer does not recall receiving training on who would pay for Lakeside's own ASL interpreter, nor does she recall receiving specific training on handling inquiries from deaf and hard-of-hearing prospective residents. Vollmer Dep., RE 32-8, PageID.860.

Three tests were required because in the first two, there was some ambiguity on Lakeside's position. On May 24, 2019, a tester visited Lakeside on behalf of his deaf brother, informing the agent that his brother was deaf and asked if there was someone there trained in ASL; Waltonwood's agent responded that she had some high school training in ASL, but no one on staff was an ASL interpreter. Testing File, RE 32-5, PageID.721.

On March 27, 2020, a tester called Lakeside also on behalf of a deaf brother. *Id.* The tester informed the agent, Jodie Ware, that her brother is deaf and asked whether there was an ASL interpreter available. Testing File, RE 32-5, PageID.731. Ms. Ware stated that they did not have one available. *Id.* The tester then asked about any other accommodations the facility would be able to provide. *Id.* The agent then

stated that she would think outside the box and suggested a pen and paper to use with the tester's deaf brother. *Id.* The agent, Ms. Ware, was a move-in coordinator for the facility, Ware Dep., RE 32-10, PageID.956, and she has no memory of any specific training regarding reasonable accommodations for deaf people. Testing File, RE 32-5, PageID. 961-964.

### C. Necessity of interpreters at Waltonwood

Waltonwood acknowledged the potential use of ASL interpreters at Royal Oak and Lakeside:

> **Q. Do you believe that . . . that [Waltonwood] would provide an ASL interpreter free of charge for [a] deaf individual, so that he or she could also participate in [a] group activity?**
> A. That could be an accommodation.
>
> **Q. What about in the incident of where a deaf individual is getting medical services, would that be a situation in which [Waltonwood] would provide an American sign language interpreter if requested?**
> A. Yes.
>
> **Q. What about if a deaf individual was signing financial paperwork or the on boarding paperwork to actually live at [Waltonwood], and that individual requested an American sign language or interpreter to discuss the legally binding contract that they were about to sign, would that be something that [Waltonwood] would be able to provide in that situation?**
> A. Yes.

Tyshka Dep., RE 32-7, PageID.791-792. Nor was there any evidence presented with an undue burden:

**Q.** **Have ever there been a time where [Waltonwood] denied a request for an accommodation based on an undue burden?**

A. Not that I'm aware of, no.

Tyshka Dep., RE 32-7, PageID.792.

## III. The District Court granted summary judgment in Waltonwood's favor, concluding that the Fair Housing Center failed to show how ASL interpreters were "necessary"

The Fair Housing Center sued Waltonwood for violations of the Fair Housing Act, Affordable Care Act, Rehabilitation Act, and Michigan Persons with Disabilities Civil Rights Act ("PWDCRA").[2] Compl., RE 1, PageID.4. Waltonwood moved for summary judgment, which the District Court granted. Opinion and Order, RE 35, PageID.1212. According to the District Court, the Fair Housing Center "failed to articulate the circumstances under which an ASL interpreter would be necessary." Opinion and Order, RE 35, PageID.1228. The District Court's reasoning was two-fold: (1) "testers did not request an interpreter for certain, limited occasions, but asked if the facilities had an interpreter on staff or if they would provide one in general free of charge," and (2) testers "also did not respond to or reject Waltonwood's suggestions regarding other methods of communication, including a communication board, pen and paper, or the availability of other residents who sign." Opinion and Order, RE 35, PageID.1229.

---

[2] The Fair Housing Center is not pursing an appeal under the Rehabilitation Act and the Affordable Care Act.

Underpinning this analysis was the District Court's summation that the "necessity of an ASL interpreter – even in the hospital or criminal justice context – is not a given as a matter of law." Opinion and Order, RE 35, PageID.1229; Opinion and Order, RE 35, PageID.1226-1227 (same). In reaching this conclusion, however, the District Court relied on two cases that found genuine issues of material fact and a third that considered a post-trial appeal under a clearly-erroneous standard after a factfinder had already assessed the evidence. Opinion and Order, RE 35, PageID.1229-1230 (citing cases). At no point did the District Court consider whether an ASL interpreter was necessary given the fact-intensive circumstances of prospective residents who were deaf and could only communicate in ASL—not English (either through lipreading or note writing). Testing File, RE 32-5, PageID.702 & 721.

## SUMMARY OF THE ARGUMENT

Fair-housing work must be proactive, not reactive, to ensure that everyone receives equal treatment at nursing homes and assisted living facilities the exact moment they need it. To that end, the Fair Housing Center, through a multi-step investigation, uncovered that Waltonwood discriminated against deaf people by refusing to provide ASL interpreters to afford equal enjoyment of and access to Waltonwood's services. Under state and federal law, disability discrimination includes the refusal to make reasonable accommodations "when such

accommodations *may be necessary* to afford [the individual with a disability an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B) (emphasis added); M.C.L. § 37.1506a(1)(b) (parallel provision under the PWDCRA). According to this Court, the word "may" uses "its 'common-sense' permissive definition unless the context of the statute suggests otherwise." *Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 783 n.1 (6th Cir. 2003) (quoting *United States v. Rodgers*, 461 U.S. 677, 706–07 (1983)). Here, there is no reason to change the permissive construction to mandatory, and the Fair Housing Center has presented genuine issues of material fact as to whether ASL interpreters are reasonable accommodations.

The Fair Housing Center conducted tests at Waltonwood's Royal Oak and Lakeside facilities, which ultimately declined to provide ASL interpreters under any circumstances. Testers asked for an ASL interpreter under the premise that their relative was deaf and could not communicate in English (either through lipreading or note writing). Testing File, RE 32-5, PageID.702 & 721. Royal Oak stated that "the facility couldn't pay for an ASL interpreter" and instead offered a communication board, *id.*—even though Royal Oak has offered no evidence of undue burden. Tyshka Dep., RE 32-7, PageID.790-793. Likewise, Lakeside stated that "they do not provide ASL interpreters" and suggested that the tester "hire someone," Testing File, RE 32-5, PageID.721—again, with no evidence of undue

burden. Tyshka Dep., RE 32-7, PageID.790-793. At most, Lakeside offered a pen and paper to communicate and other residents who sign. Testing File, RE 32-5, PageID.732 & 738.

The District Court granted summary judgment for Waltonwood on the ground that the testers "failed to articulate the circumstances under which an ASL interpreter would be necessary." Opinion and Order, RE 35, PageID.1228. Likewise, the District Court relied on "suggestions regarding other methods of communication, including a communication board, pen and paper, or the availability of other residents who sign." Opinion and Order, RE 35, PageID.1229. As a preliminary matter, a defendant-entity is "not discharged of its obligation to ensure effective communication merely because [a plaintiff] did not engage in further discussion . . . regarding measures other than an ASL interpreter." *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 964–965 (9th Cir. 2019). Furthermore, if an individual cannot communicate in English, a communication board or pen and paper are not options at all, and a covered entity cannot shift its legal responsibilities to other residents who may use ASL. 28 C.F.R. § 36.303(c)(3)[3] (stating that a defendant-entity "shall not require an individual with a disability to bring another individual to interpret for him

---

[3] "Such regulations, if valid and reasonable, authoritatively construe the statute itself, and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) (internal citations omitted).

or her"); *see also* Opinion and Order, RE 35, PageID.1227 (citing ADA regulations, such as 28 C.F.R. § 36.303, under the FHA analysis).

At this summary-judgment stage, two points are paramount. "Whether a requested accommodation is required by law is highly fact-specific, requiring case-by-case determination," and state and federal law "imposes an affirmative duty upon landlords reasonably to accommodate the needs of" those with disabilities. *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001) (cleaned up). Under this fact-intensive analysis, Waltonwood's Royal Oak and Lakeside had ample information to investigate whether ASL was the only means to communicate for these hypothetical deaf individuals. *See, e.g.*, *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 862, 869 (9th Cir. 2022) ("It is axiomatic that an entity's duty to look into and provide a reasonable accommodation may be triggered when the need for accommodation is obvious, even if no request has been made.") (cleaned up); *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, then-D.J.) (dismissing the idea that a defendant-entity "need not act to accommodate an obviously disabled [individual] if the [individual] does not ask for accommodations" as "truly baffling as a matter of law and logic"). The statutes make no requirement for deaf individuals to delineate each communication that would require an ASL interpreter, nor would there be an opportunity to do so if Waltonwood categorically denied the use of ASL interpreters. Furthermore, Waltonwood agreed that an ASL

interpreter could be an accommodation to receive medical services, participate in group activities, and even sign financial and on-boarding paperwork. Tyshka Dep., RE 32-7, PageID.758 & 791-793. Thus, for all these reasons, this Court should reverse and remand for further proceedings.

## ARGUMENT

### I. Standard of review

Under de novo review, summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). In evaluating the record for purposes of ruling on a motion for summary judgment, the trial court must draw all reasonable inferences from the facts in the light most favorable to the non-moving party. *Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

### II. Summary judgment was improper because whether an accommodation "may be necessary" is a fact-intensive analysis, especially given Waltonwood's categorical refusal to provide ASL interpreters

To establish a reasonable accommodation claim, the Fair Housing Center must show that (1) a prospective tenant "is disabled, (2) she requested an accommodation, (3) the defendant housing provider refused to make the accommodation, (4) the accommodation was reasonable and [may be] necessary, and (5) the defendant knew or should have known about the disability at the time of

the refusal." *See* Opinion and Order, RE 35, PageID.1225-1226 (citing *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014)). As for the fourth element, disability discrimination "includes the refusal to make reasonable accommodations in 'rules, policies, practices, or services, when such accommodations *may be necessary* to afford [the individual with a disability an] equal opportunity to use and enjoy a dwelling.'" *Groner*, 250 F.3d at 1044 (quoting 42 U.S.C. § 3604(f)(3)(B)) (emphasis added); M.C.L. § 37.1506a(1)(b) (parallel provision under the PWDCRA). The FHA and PWCDRA are construed coextensively with the Americans with Disabilities Act. *See Jones v. City of Akron*, No. 19-3286, 2020 U.S. App. LEXIS 35650, at *5 (6th Cir. Nov. 12, 2020); *Bachman v. Swan Harbour Ass'n*, 252 Mich. App. 400, 416–19, 653 N.W.2d 415 (2002).

Moreover, the FHA "imposes an affirmative duty upon landlords reasonably to accommodate the needs of" those with disabilities, and "[w]hether a requested accommodation is required by law is highly fact-specific, requiring case-by-case determination."[4] *Groner*, 250 F.3d at 1044 (cleaned up). Under this fact-intensive

---

[4] Sister circuits are in accord. *See, e.g.*, *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 342–43 (11th Cir. 2012) ("We begin with the obvious: the task of determining whether an entity subject to [federal law] has provided appropriate auxiliary aids where necessary is inherently fact-intensive.") (collecting cases); *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment.").

inquiry, "an FHA reasonable-accommodation . . . plaintiff must show that, but for the requested accommodation or modification, he likely will be denied an equal opportunity to enjoy the housing of his choice." *Hollis*, 760 F.3d at 541. Indeed, the FHA "requires accommodations that are necessary for a disabled person to use and enjoy a home as a non-disabled person could, not merely accommodations that are necessary for a disabled person to live or remain in a home." *Phillips v. Acacia on the Green Condo. Ass'n*, No. 20-4182, 2022 U.S. App. LEXIS 14688, at *6 (6th Cir. May 26, 2022); *Anderson v. City of Blue Ash*, 798 F.3d 338, 362 (6th Cir. 2015) (same). Also, "the phrase 'equal opportunity,' at least as used in [federal law], is concerned with achieving equal results, not just formal equality. . . . The statute links the term 'necessary' to the goal of equal opportunity." *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996); 42 U.S.C. § 3604(f)(3)(B) (discussing an "accommodation . . . necessary to afford . . . equal opportunity"). "The necessity element is, in other words, a causation inquiry that examines whether the requested accommodation or modification would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive." *Hollis*, 760 F.3d at 541.

Under this rubric, the District Court erred in concluding that the Fair Housing Center "failed to articulate the circumstances under which an ASL interpreter would be necessary." Opinion and Order, RE 35, PageID.1228. Here, testers asked for ASL

interpreters for their respective relatives, who were "deaf from birth and cannot lipread, read or write English."[5] Testing File, RE 32-5, PageID.702 (Royal Oak); Testing File, RE 32-5, PageID.721 (a virtually identical statement at Lakeside). To prove that an accommodation under the FHA "may be necessary," there is only a minimum showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by "ameliorating the effects of the disability." *See Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002) (cleaned up). A request for an interpreter goes far to enhance a deaf resident's quality of life, especially deaf residents that cannot communicate in English, like the purported deaf relatives here. Indeed, "[to] deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language." *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017). Accordingly, interpreters are necessary for deaf residents. ASL interpreters used during in certain communications would ensure that a deaf resident would be able to fully understand important conversations related to a resident's

---

[5] In a virtually identical decision issued the same day, the District Court considered such a request to be noteworthy. *Fair Hous. Ctr. of Metro. Detroit v. Am. House Senior Living, LLC*, No. 21-11061, 2023 U.S. Dist. LEXIS 211631, at *15 n.6 (E.D. Mich. Nov. 28, 2023) ("Perhaps recognizing [a] flaw, the Center modified its testing protocol and directed Tester 3 to say that her grandfather 'was born deaf and cannot lipread, read or write English,' and ask whether the facility would provide an ASL interpreter 'during medical discussions or other special occasions at the facility, not on a daily basis.' Tester 3's report does not indicate that she followed this script.") (cleaned up).

enjoyment to the facility, including group activities, medical services, and the completion of onboarding or financial paperwork. Thus, a jury should make the determination on whether an ASL interpreter "may be necessary" for a deaf resident.

The District Court repeatedly stressed that the "necessity of an ASL interpreter – even in the hospital or criminal justice context – is not a given as a matter of law." Opinion and Order, RE 35, PageID.1229; Opinion and Order, RE 35, PageID.1226-1227 (same). But the three cases underlying this proposition support the Fair Housing Center, not Waltonwood. Opinion and Order, RE 35, PageID.1229-1230 (citing cases). The first case is *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017), in which the Ninth Circuit reversed a grant of summary judgment to a defendant-entity because even though an ASL interpreter was not required as a matter of law, "whether the County provided appropriate auxiliary aids where necessary [wa]s a fact-intensive exercise" unsuited for summary judgment. Likewise, the second case reiterated that it is "precisely because of this fact-intensive inquiry that an effective-communication claim often presents questions of fact precluding summary judgment." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 836 (11th Cir. 2017) (reversing a grant of summary judgment to the defendant-entity because after "[e]xamining the facts in the light most favorable to Plaintiffs . . . Plaintiffs have offered sufficient evidence to defeat summary judgment"). Finally, the third case followed suit, citing *Updike* for the proposition

that "whether written notes constitute an appropriate accommodation must be evaluated under the totality of the circumstances, and on a case-by-case basis." *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 862, 870 (9th Cir. 2022). In *Bax*, the Ninth Circuit declined to disturb the trial court's ruling against the deaf individual under a clear-error analysis but intimated that a different factfinder could have assessed the evidence differently. *Id.* at 870 n.8 ("To be sure, certain interactions with DMC staff, such as Mr. Bax's post-operative discussions with Dr. Michael Wolterbeek on October 17, 2015, may have been better facilitated by an ASL interpreter.").

The District Court also relied on a pair of decisions from other FHA testing: *Southwest Fair Hous. Council v. WG Chandler Villas SH LLC* ("*Chandler*"), No. CV-19-00178-TUC-RM, 2021 U.S. Dist. LEXIS 53677 (D. Ariz. Mar. 22, 2021), *appeal dismissed,* No. 23-16081 (9th Cir. Jan. 17, 2024) and *Southwest Fair Hous. Council v. WG Scottsdale LLC* ("*Scottsdale*"), No. CV-19-00180-TUC-RM, 2021 U.S. Dist. LEXIS 43115, at *41 (D. Ariz. Mar. 8, 2021), *aff'd*, No. 22-16345 (9th Cir. Oct. 17, 2023). Opinion and Order, RE 35, Page ID.1228. In *Chandler*, the District of Arizona concluded that a senior apartment complex did not violate the FHA because the "tester indicated that she communicated with her deaf grandfather through written notes and facility did not offer "complex services" that would require an interpreter." *Id.* Here, by contrast, none of the testers indicated that their

respective relatives used written notes; in fact, the testers indicated that there would be no comprehension in English. Testing File, RE 32-5, PageID.702 & 721. What is more, Waltonwood offers complex services that would require an ASL interpreter. *Compare* Tyshka Dep., RE 32-7, PageID.791-792 (referencing group activities, group activities, medical services, and the signing of financial and on-boarding paperwork) *with Chandler*, 2021 U.S. Dist. LEXIS 53677 at *27 ("There is no evidence in the record whatsoever that Defendant's staff members engage in discussions with residents involving the details or nature of their medical care, or any other potentially complex matters.").

The more analogous case is *Scottsdale*, in which the District of Arizona found genuine issues of material fact under the FHA:

> Defendant's employees never stated or indicated to testers that Defendant *would* provide an ASL interpreter to the deaf individual were it necessary for his full and equal access to the Sierra Pointe facility. To the contrary, [Defendant] told tester [] that not providing ASL interpreters was how the facility 'operates' and that the deaf individual would be responsible for procuring an ASL interpreter on his own, were one needed.

*Scottsdale*, 2021 U.S. Dist. LEXIS 43115 at *41. Thus, the District of Arizona correctly found that a factfinder would "have to determine whether or not Defendant's responses to Plaintiff's requests for an ASL interpreter constituted a refusal or failure to provide a reasonable accommodation in violation of the FHA." *Id.* at *41–42. Waltonwood's Royal Oak and Lakeside facilities also categorically

denied the use of ASL interpreters: Royal Oak stated that "the facility couldn't pay for an ASL interpreter," Testing File, RE 32-5, PageID.702, and Lakeside stated that "they do not provide ASL interpreters" and suggested that the tester "hire someone." Testing File, RE 32-5, PageID.721. Pertinently, "'[a] categorical refusal to provide ASL interpreters to deaf residents fails to make a reasonable accommodation' and therefore violates [federal law]." *Scottsdale*, 2021 U.S. Dist. LEXIS 43115 at *28 (quoting *Fair Hous. Justice Ctr.*, *Inc. v. Allure Rehab. Servs. LLC*, No. 15CV6336RJDLB, 2017 U.S. Dist. LEXIS 157882, at *4 (E.D.N.Y. Sept. 26, 2017)); *Chandler*, 2021 U.S. Dist. LEXIS 53677 at *27 (same).

Two other aspects of the District Court's decision warrants attention. The District Court stated that testers "did not respond to or reject Waltonwood's suggestions regarding other methods of communication, including [1] a communication board, [2] pen and paper, or [3] the availability of other residents who sign." Opinion and Order, RE 35, PageID.1229. There is no requirement to do so. As the Ninth Circuit correctly concluded, a defendant-entity is "not discharged of its obligation to ensure effective communication merely because [a plaintiff] did not engage in further discussion . . . regarding measures other than an ASL interpreter." *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 964–965 (9th Cir. 2019) (addressing a defendant-entity's "argument that it satisfied its obligations under the ADA because [the plaintiff] refused to engage in a discussion about

alternative auxiliary aids other than an ASL interpreter"). "This argument is based on the ADA's requirements in the employment context," but the "ADA does not make this 'interactive process' requirement applicable to public accommodations and services," which is the law that the FHA follows. *See id.* at 941.

Even on the merits, Waltonwood's suggestions do not afford equal access or treatment. Beginning with the third suggestion, federal regulations, which authoritatively construe the ADA, prohibit a defendant-entity from "requir[ing] an individual with a disability to bring another individual to interpret for him or her." 28 C.F.R. § 36.303(c)(2); *see also Tauscher*, 931 F.3d at 963 ("Because the regulations expressly provide that a public accommodation may not require disabled individuals to provide their own interpreter, *see* 28 C.F.R. § 36.303(c)(2), [the defendant-entity's] suggestion that Tauscher bring a friend to the class to interpret for him does not meet [the entity's] obligations to provide effective communication.").

As for the first two methods (communication board or pen and paper), the testers made clear that their respective relatives were "deaf from birth and cannot lipread, read or write English." Testing File, RE 32-5, PageID.702 (Royal Oak); Testing File, RE 32-5, PageID.721 (a virtually identical statement at Lakeside).

Accordingly, these methods would not work.[6] 28 C.F.R. § 36.303(c)(1)(ii) ("The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual . . . ."). Even if the prospective residents had some proficiency in English, "the exchange of written notes is not appropriate" for complex communications, such as "'communication of instructions for care at home or elsewhere.'" *Silva*, 856 F.3d at 837 n.8 (quoting 28 C.F.R. Pt. 36, App'x A). Indeed, the U.S. Department of Justice, which is entitled to deference, has specified that exchanging notes is not appropriate during such "complex or lengthy exchanges," such as group activities:

> For brief or simple face-to-face exchanges, very basic aids are usually appropriate. For example, exchanging written notes may be effective when a deaf person asks for a copy of a form at the library. For more complex or lengthy exchanges, more advanced aids and services are required.

U.S. Dep't of Justice, Title II Technical Assistance, ADA Best Practices Tool Kit for State and Local Governments – Ch. 3, A. Providing Equally Effective Communication (Feb. 27, 2007), https://archive.ada.gov/pcatoolkit/chap3toolkit.htm. The operative word is

---

[6] Waltonwood provided no explanation on the type of "communication board" to be used. If this board contained statements in English, this method would not work as described above, and if this board merely contained pictures, this method would not guarantee equal treatment as compared to those residents who can communicate in their primary language and/or be able to express themselves fully. *See Silva*, 856 F.3d at 829 ("Nor is it a sufficient defense for a defendant merely to show that a plaintiff could participate in the most basic elements of a[n] . . . exchange.").

"required"—not "suggested."[7] This reasoning is likely because when an entity relies on note writing, the average deaf person cannot "communicate in real time" and is "required to communicate outside of their native language, with major barriers to expressing tone and emotion." *Rogers v. Colo. Dep't of Corr.*, No. 16-cv-02733-STV, 2019 U.S. Dist. LEXIS 159001, at *46–47 (D. Colo. Sep. 18, 2019) (analyzing text telephones or "TTYs"—the functional equivalent of note writing) *see also McBride v. Mich. Dep't of Corr.,* 294 F. Supp. 3d 695, 707 (E.D. Mich. 2018) (reviewing "ample evidence" that for deaf and hard of hearing persons who communicate in ASL, "TTYs are not a practical or effective communication tool").

In referencing these proposed alternatives, the District Court makes no reference to the undue-burden standard, which is a "high bar." *Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427, 437–39 (D. Md. 2016) (holding that the deaf nurse's request for a full-time ASL interpreter, which would cost $120,000 per year, was reasonable and not an undue hardship); *Alabi v. Atlanta Pub. Schs.,* No. 1:12-cv-0191-AT, 2013 U.S. Dist. LEXIS 188129 (N.D. Ga. Sept. 26, 2011) (finding lack of evidence for the defendant to establish undue hardship where the cost of full-time

---

[7] This Court has noted that "the Department of Justice's Technical Assistance Manual, which as an interpretation by the Department of its own regulations[,] is entitled to substantial deference." *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998).

interpreter was $85,000 a year for a deaf employee with a salary of $53,000).

Waltonwood presented no evidence of undue burden:

> **Q.    Have ever there been a time where [Waltonwood] denied a request for an accommodation based on an undue burden?**
>
> A.    Not that I'm aware of, no.

Tyshka Dep., RE 32-7, PageID.792.

Furthermore, the District Court stated that "testers did not request an interpreter for certain, limited occasions, but asked if the facilities had an interpreter on staff or if they would provide one in general free of charge." Opinion and Order, RE 35, PageID.1229. There is no requirement to do this either. The FHA "imposes an affirmative duty upon landlords to reasonable accommodate the needs of handicapped persons." *United States v. California Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1416 (9th Cir. 1994). In upholding this affirmative duty, courts have determined that a plaintiff need not use the "magic words" to trigger a defendant's duty to provide an accommodation for a particular type of interaction so long as plaintiff's request contains sufficient information to place a defendant on notice. *See Sacred Heart Rehab. Ctr., Inc. v. Richmond Twp.,* No. 08-12110, 2010 U.S. Dist. LEXIS 106739, at *7 (E.D. Mich. Oct. 6, 2010) (finding that the word "accommodation" is not necessary to request a reasonable accommodation); *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, then-D.J.) (dismissing the idea that a defendant-entity "need not act to accommodate an

obviously disabled [individual] if the [individual] does not ask for accommodations" as "truly baffling as a matter of law and logic"). Likewise, if a deaf individual asks a doctor or nurse for an interpreter, she need not delineate each type of interaction requiring interpretation. Or if a deaf individual gets pulled over for a traffic stop, she need not clarify whether her request for an interpreter is for the roadside stop, the *Miranda* readings, an interrogation, and so on. And specifically, in this context, this rule makes sense; Waltonwood has all the relevant information on which services are available, and testers are calling to receive that information.

At any rate, it is evident that Waltonwood was made aware of specific facts that the testers' relatives could not communicate outside of ASL. ASL "interpreters are a common form of reasonable accommodation." *Noll v. IBM*, 787 F.3d 89, 96 (2d Cir. 2015). It is not difficult to imagine a wide range of communications involving areas such as health, legal matters, finances, and group discussions that would be sufficiently lengthy or complex to require an interpreter for effective communication. *Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1167 (E.D. Mich. 1994). ASL interpreters used during these communications would ensure that a deaf resident would be able to fully understand important conversations related to a resident's enjoyment to the facility, including participating in group activities, discussing medical services, and signing onboarding or financial paperwork.

Yet, without discussing the possibility of an ASL interpret for any occasion, Waltonwood made clear that they would not provide an ASL interpreter under any circumstances. This is evidence of a categorical exclusion of deaf people from Waltonwood's facilities. *See Southwest Fair Hous. Council v. WG Campana del Rio SH LLC*, No. CV-19-00179-TUC-RM, 2021 U.S. Dist. LEXIS 18357, at *40–41 (D. Ariz. Feb. 1, 2021) (determining that the defendant-employee's statement "that the deaf individual would need to procure an ASL interpreter 'on her own' could be interpreted to mean that defendant was unwilling to provide an ASL interpreter, regardless of whether that accommodation was necessary or reasonable"), *aff'd*, No. 22-16345 (9th Cir. 2023). Indeed, in all of the testers' interactions with Waltonwood, the employees never stated or indicated to the testers that Waltonwood would provide an ASL interpreter for any occasion, so it is illogical to chide the testers for failing to request interpreters for specific interactions. Nor did the District Court factor in Waltonwood's affirmative duty.

Construing all facts in favor of the Fair Housing Center, Waltonwood has failed to implement appropriate training relating to deaf individuals and providing auxiliary aids. Trainings on providing auxiliary aids is a critical component for ensuring effective communication. *See* U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, ADA Requirements, Effective Communication, https://bit.ly/2PqLHpD (Feb. 28, 2020) ("[A] critical and often overlooked

component of ensuring success is comprehensive and ongoing staff training. Covered entities may have established good policies, but if front line staff are not aware of them or do not know how to implement them, problems can arise.") Here, Waltonwood provided no training on the Fair Housing Act to its employees. Consequently, Waltonwood's staff did not know what do when they received a disability-accommodation request. Accordingly, Waltonwood's lack of training and the employees' statements are evidence of a categorical exclusion of deaf people from Waltonwood's facilities. For all these reasons, the Fair Housing Center has established genuine issues of material fact precluding summary judgment, and this Court must reverse and remand for further proceedings.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed and remanded.

/s/ Andrew Rozynski
Andrew Rozynski
David John Hommel
Reyna Lubin
Eisenberg & Baum, LLP
24 Union Square East, PH
New York, NY 10003
(212) 353-8700

arozynski@eandblaw.com
dhommel@eandblaw.com
rlubin@eandblaw.com
*Attorneys for Appellant*

**Form 6.  Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit  of Fed. R. App. P. [ **32(a)(7)(B)** _____ ]] [the word limit of Fed. R. App. P. [ **32(a)(7)(B)** _____ ]] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) [and [ **N/A** _____ ]]:

   ☑ this document contains **6,226** _____ words, or

   ☐ this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this document has been prepared in a proportionally spaced typeface using **Times New Roman** _____ in

   **size 14 font** _____ , or

   ☐ this document has been prepared in a monospaced typeface using

   _____ with

   _____ .

   /s/ **Andrew Rozynski** _____

   Attorney for **Plaintiff-Appellant Fair Housing Center** _____

   Dated: **January 23, 2024** _____

11/16

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2024, I electronically filed this brief with the Clerk of the Court, using the appellate CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and received an electronic copy through that service.

/s/ Andrew Rozynski
Andrew Rozynski
David John Hommel
Reyna Lubin
Eisenberg & Baum, LLP
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com
dhommel@eandblaw.com
rlubin@eandblaw.com
*Attorneys for Appellant*

**ADDENDUM**

I.      RE 1, Compl., PageID.1-26

II.      RE 32-5, Testing File, PageID.702-738

III.      RE 32-7, Tyshka Dep., PageID.745-838

IV.      RE-32-8, Vollmer Dep., PageID.839-878

V.      RE-32-9, Wagner Dep., PageID.879-945

VI.      RE-32-10, Ware Dep., PageID.946-1007

VII.      RE 35, Opinion and Order, PageID.1212-1231